AO 91 (Rev. 11/11) Criminal ComplaintAUSA Andrew Erickson (312) 353-1875

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ILIJA RISTIK,<br>    also known as "IKO" | CASE NUMBER:<br>UNDER SEAL   **21 CR 323** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about April 15, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1343 and 1346 | having knowingly and intentionally devised and participated in a scheme to defraud and deprive Victim Company 1 of its intangible right to the honest services of Individual A, by means of materially false and fraudulent pretenses, representations, promises, concealment of material facts, bribery, and kickbacks, defendant transmitted and caused to be transmitted by means of wire communication in interstate commerce, a writing, sign, and signal for the purpose of executing such scheme |

This criminal complaint is based upon these facts:

  X  Continued on the attached sheet.

TODD D. RATHBUN
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: May 21, 2021

*Judge's signature*

City and state: Chicago, IllinoisJEFFREY CUMMINGS, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, TODD D. RATHBUN, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation, and I am assigned to its Chicago Division. I have been so employed since 2016. During my career as a Special Agent, I have investigated criminal violations relating to white collar crime. I am currently assigned to an FBI squad dedicated to the investigation of federal wire and mail fraud offenses, as well as related financial crimes.

2. This affidavit is submitted in support of a criminal complaint alleging that ILIJA RISTIK, also known as "IKO," has violated Title 18, United States Code, Sections 1343 and 1346. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging RISTIK with honest services wire fraud, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. Unless otherwise stated, the information in this affidavit is either personally known to me or has been provided to me by other law enforcement officers, government employees, and other persons and/or is based on a review of various documents and materials as more particularly described herein. The information in this affidavit is also based upon interviews, including FBI interviews with

representatives from Victim Company 1 and other companies impacted by the scheme. In addition, the information in this affidavit is based on my review of certain bank, business, and other records gathered during the FBI's investigation.

## I. FACTS ESTABLISHING PROBABLE CAUSE

4. As explained in more detail below, the investigation to date has revealed that, beginning in or about November 2018 and continuing through in or about December 2019, Individual A received regular kickback payments from RISTIK—totaling more than $280,000—in exchange for Individual A steering millions of dollars of trucking business to RISTIK's companies. Throughout the scheme, Individual A worked as an executive at Victim Company 1 and Individual A did not disclose these kickback payments to Victim Company 1, notwithstanding the obligation to do so. Accordingly, RISTIK and Individual A's bribery and kickback scheme, as described herein, deprived Victim Company 1 of its intangible right to the honest services of Individual A.

### A. Background on Victim Company 1, Individual A, and Company A

5. According to public records, Victim Company 1 is headquartered in Arkansas and is one of the largest surface transportation, delivery, and logistics companies in North America. Victim Company 1 primarily operates large semi-trailer trucks and provides transportation and delivery services throughout the United States, Canada, and Mexico. As of December 31, 2019, Victim Company 1 employed approximately 19,000 company drivers and 1,600 independent contractors. In addition, Victim Company 1 also used thousands of unrelated, outside carriers.

2

According to Victim Company 1's annual report filed on Form 10-K for the year ending December 31, 2019, Victim Company 1 had operating revenues of approximately $9.2 billion.

6. According to representatives from Victim Company 1, Individual A worked as Vice President of Intermodal ("VPI") in Chicago, Illinois. Individual A's job duties primarily included overseeing Victim Company 1's truck and rail container traffic relating to the transportation of shipping containers in the Chicago and Midwest regions. In performing those services, Victim Company 1 used a combination of its own carriers and outside carriers that Victim Company 1 contracted with.

7. According to Victim Company 1 personnel, as VPI, Individual A's job duties did not include assigning loads (i.e., freight transportation jobs) to Victim Company 1's outside carriers. Instead, Individual A had several employees beneath him that performed those duties. Those employees included, amongst others, Employee A, Employee B, Employee C, and Employee D. Employee A was a Director and Employee D was an Operations Service Manager, both of whom reported to Individual A. Employee B was a Logistics Planner and Employee C was a Manager, both of whom reported to Employee A. While Individual A's duties did not involve assigning loads to carriers, according to Individual A, he had the ability to direct his employees, including Employee A, Employee B, Employee C, and Employee D to assign loads to certain carriers.

8. According to Individual A, he was aware that, as a Victim Company 1 employee and officer, he was required to abide by Victim Company 1's Code of Ethical

3

and Professional Standards ("Code of Ethics").[1] According to the Code of Ethics, that code applied to all Victim Company 1 officers, directors, and employees, and their interactions and relationships with Victim Company 1's vendors, contractors, and suppliers. The Code of Ethics included a policy requiring Victim Company 1 employees to exemplify fair dealing in all encounters with customers, vendors, contractors, and others. In doing so, while small gifts, gratuities, and/or entertainment were permissible on an occasional basis, any money or gift in excess of $25 was required to be reported to the office of the Chief Financial Officer. The Code of Ethics highlighted that gifts must never influence, or even have the appearance of influencing, decisions or be considered part of "doing business." According to the Code of Ethics, it was never acceptable to solicit gifts or gratuities for the personal benefit of Victim Company 1 employees. Furthermore, the Code of Ethics noted that employees were not to take part in any improper payments, bribes, kickbacks, or payments meant to influence business decisions.

9. According to records obtained from the Illinois Secretary of State, Company A was organized on or about October 29, 2018, and Individual A was listed as its sole manager. Company A's principal office was listed as Individual A's home address located in Plainfield, Illinois. According to bank records obtained in this

---

[1] Individual A is aware he has criminal exposure for the conduct described in this complaint and is cooperating with the government in the hopes of a charging and/or sentencing benefit. No promises have been made to Individual A about what benefit, if any, he will receive for his cooperation. Information provided by Individual A has been found to be reliable, including as corroborated by bank records, text messages, and interviews of other witnesses. Individual A has never been charged with or convicted of a crime.

matter, Individual A opened a bank account for Company A at JP Morgan Chase ("Chase") on or about October 30, 2018, the day after organizing the company. Individual A was listed as the sole signatory on Company A's bank account. According to Individual A, he created Company A in late October 2018 to operate his business ventures outside his employment with Victim Company 1. Around that time, Individual A was starting to plan his exit from Victim Company 1 to become an entrepreneur. According to Company A's website, Company A was "a private equity firm based in Chicago, IL that acquires, manages, and builds small to middle-market companies, with small portfolio companies across the country."

### B. Background on RISTIK, Company B1, and Related Companies

10. According to public records, Company B1 was a trucking company located in Des Plaines, Illinois, and registered with the U.S. Department of Transportation ("USDOT"). According to an Outsource Carriage Agreement provided by Victim Company 1, Company B1 entered the Outsource Carriage Agreement with Victim Company 1 on or about February 20, 2018. RISTIK signed the Agreement on behalf of Company B1 as Company B1's "CEO."

11. According to Employee A, Employee B, Employee C, and Employee D, RISTIK was the primary person at Company B1 that Victim Company 1 employees interacted with when establishing and maintaining its business relationship with Company B1. According to records provided by Victim Company 1, Company B1 began carrying loads for Victim Company 1 in or about March 2018 and continued

5

through in or about December 2019. According to Individual A, Company B1 was RISTIK's company.

12. According to public records, Company B2 was a trucking company located in Davie, Florida, and registered with the USDOT. While Company B2 was not registered to RISTIK, according to Individual A, RISTIK told Individual A that RISTIK was the President and owner of Company B2. According to Individual A, in or about October or November 2019, RISTIK began operating Company B1 under Company B2's name. Company B2 used the same trucks and drivers as Company B1 and, from Individual A's perspective, everything about Company B1 and Company B2 was the same except for their names. Furthermore, based on an interview I conducted with Individual C, a former truck driver for Company B1, Company B1 began operating under the name Company B2 in or about November 2019. Based on records provided by Victim Company 1, on or about December 6, 2019, RISTIK signed an amendment to Company B2's existing Outsource Carriage Agreement with Victim Company 1. RISTIK signed that agreement as the authorized representative and CEO of Company B2. Lastly, based on records provided by Company B2's invoice factoring company, on or about December 9, 2019, Company B2's records were updated to add RISTIK as the "Owner" of Company B2. As a result, for purposes of this affidavit, Company B2 is included, along with Company B1, in the definition of "Company B Companies."

13. According to public records, Company B3 was a trucking company located in Justice, Illinois, and registered with the USDOT. While Company B3 was

not registered to RISTIK, according to Victim Company 1's Senior Director of Security and its Senior Vice President of Intermodal Operations, in or about late 2019, Company B1's trucking volumes appeared to be transferred from Company B1 to Company B3. In addition, according to both Employee A and Employee B, in or about October 2019, RISTIK changed Company B1's name to several different company names. Furthermore, based on an interview I conducted with Individual D—a person familiar with the operations, management, and ownership of Company B3 based on his personal relationship with the owner of Company B3—RISTIK, through Company B1, entered an Independent Contractor Agreement (ICA) with Company B3 on or about November 21, 2019, to provide transportation services to Company B3. Individual D provided me with a copy of the referenced ICA by and between Company B1 and B3, which I have reviewed. RISTIK signed the referenced ICA as Company B1's representative. According to data provided by Company B3, Company B1 transported Victim Company 1 loads under the ICA it had with Company B3 from approximately mid-November 2019 to mid-December 2019. As a result, for purposes of this affidavit, Company B3 is also included in the definition of "Company B Companies."

14. According to public records, Company B4 was a company located in Chicago, Illinois. According to Company B4's Chase bank records, Company B4 was a trucking company. While Company B4 was not registered to RISTIK, based on an interview I conducted with Individual C, Company B4 issued Company B1's payroll payments to its drivers from, at a minimum, October 2019 through December 2019.

7

In addition, according to Individual D, RISTIK instructed Individual D to direct Company B1's payments under the previously referenced ICA to be sent to bank accounts held by Company B2 and Company B4. While RISTIK did not tell Individual D that Company B4 was RISTIK's company, Individual D understood Company B4 to be associated with RISTIK. Furthermore, based on my review of Company B1's and Company B4's bank records, Company B1 and Company B4 engaged in frequent business and/or transfers of funds between their respective bank accounts during the period October 2018 through November 2019. In addition, based on my review of Company B1's and Company B2's factoring company records, Company B4 received frequent payments from the factoring company based on the invoices of Company B1 and Company B2 during the period October to December 2019. As a result, for purposes of this affidavit, Company B4 is also included in the definition of "Company B Companies."

### C. There is Probable Cause to Believe that RISTIK Engaged in a Kickback Scheme that Deprived Victim Company 1 of Individual A's Honest Services

15. According to Individual A, he originally met RISTIK in or about 2015 or 2016. In or about Spring 2018, Individual A ran into RISTIK again and asked RISTIK to enter business with Victim Company 1. According to Victim Company 1, in or about March 2018, it began using Company B1 as one of its outside carriers to transport freight in the Chicago and Midwest region. According to data provided by Victim Company 1, Company B1 began transporting loads for Victim Company 1 in or about March 2018.

16. As previously described, according to Individual A, in or about 2018, he was starting to plan his exit from Victim Company 1 to become an entrepreneur. Individual A wanted one of his first business ventures to be in the trucking industry and saw working with RISTIK as an opportunity to build such a venture. As a result, in or about early November 2018, Individual A emailed a "consulting agreement" to RISTIK by and between Individual A's company (Company A) and RISTIK's company (Company B1) which Individual A electronically signed. Individual A provided the government with a copy of the email he sent to RISTIK and the referenced consulting agreement, which I have reviewed. According to Individual A, shortly after Individual A emailed this agreement to RISTIK, RISTIK told Individual A he did not want to sign it while Individual A was still with Victim Company 1. It was Individual A's impression that RISTIK was afraid Victim Company 1 would find out about the agreement and "there would be problems." Instead of signing the agreement, RISTIK orally promised to "always take care of" Individual A. Specifically, RISTIK told Individual A he would pay him approximately $5,000 per week for generating business for Company B1. According to Individual A, while RISTIK never explicitly said he would make payments to Individual A in return for steering Victim Company 1 business to RISTIK, that was Individual A's understanding of their agreement, it was what Individual A believed RISTIK understood their agreement to be, and it was what in fact happened.

17. According to Individual A, based on his position at Victim Company 1, he was able to steer Victim Company 1 business to Company B1. To do so, Individual

9

A told Victim Company 1 employees including, but not limited to, Employee A, Employee B, Employee C, and Employee D, to use Company B1 and give Company B1 trucking volume from Victim Company 1. Victim Company 1 employees did as Individual A asked.

18. Based on data provided by Victim Company 1, during the first few months of its business relationship with Company B1, Company B1 was assigned a small volume of loads to transport. That volume began to increase between March and September 2018. Then, beginning in October 2018, Company B1's volume nearly tripled compared to the prior month from approximately 830 loads to 2,187 loads resulting in an increase of revenue for Company B1 of approximately $1 million, as follows:

| Month | Loads | Revenue (rounded) |
|---|---|---|
| Mar 2018 | 77 | $ 14,000 |
| Apr 2018 | 103 | $ 19,000 |
| May 2018 | 186 | $ 35,000 |
| Jun 2018 | 236 | $ 44,000 |
| Jul 2018 | 439 | $ 127,000 |
| Aug 2018 | 501 | $ 169,000 |
| Sep 2018 | 830 | $ 359,000 |
| Oct 2018 | 2,187 | $ 1,377,000 |

19. As previously noted, Individual A formed Company A and opened its bank account at Chase in late October 2018. Based on my review of Company A's bank account, approximately one week after opening the account, Individual A began depositing check payments from Company B1 into the account. From approximately November 8 to November 16, 2018, Individual A deposited five checks from Company

10

B1 totaling $15,000 into Company A's bank account. Each of those checks contained a memo indicating they were for "payroll." Individual A deposited an additional $15,000 in checks from Company B1 in November 2018. During the months December 2018 to October 2019, Individual A continued to deposit, and/or cause to be deposited, checks from Company B1 into Company A's account in increments of $5,000 or $2,500 totaling, on average, approximately $20,000 per month.[2] In total, Individual A deposited approximately $247,500 from Company B1 into Company A's bank account during the period November 2018 to October 2019, as follows:

| Month | Amount |
|---|---|
| Nov 2018 | $ 30,000 |
| Dec 2018 | $ 20,000 |
| Jan 2019 | $ 20,000 |
| Feb 2019 | $ 20,000 |
| Mar 2019 | $ 20,000 |
| Apr 2019 | $ 22,500 |
| May 2019 | $ 22,500 |
| Jun 2019 | $ 15,000 |
| Jul 2019 | $ 20,000 |
| Aug 2019 | $ 22,500 |
| Sep 2019 | $ 25,000 |
| Oct 2019 | $ 10,000 |
| Total | $ 247,500 |

20. According to Individual A and based on my review of Company A's bank account records, beginning in October 2019, Company B1 stopped issuing checks to Company A and, instead, Company A's bank account began receiving QuickPay

---

[2] According to Individual A, RISTIK provided some of the above referenced check payments to Individual A in person. Afterwards, RISTIK started depositing the checks directly into Company A's bank account on behalf of Individual A. Later, RISTIK started paying Individual A by QuickPay transfers from Company B4, as described below.

11

transfers from Company B4. As previously described, Company B4 was a trucking company affiliated with Company B1 that, as of that time (October 2019), was issuing Company B1's payroll checks and involved in a business and/or financial relationship with Company B1. Similar to the payments previously issued by Company B1, the payments from Company B4 to Company A were primarily in increments of $2,500. In total, during the months October 2019 to December 2019, Company A received $33,000 in transfers from Company B4, as follows:

| Month    | Amount    |
|----------|-----------|
| Oct 2019 | $ 12,500  |
| Nov 2019 | $  5,000  |
| Dec 2019 | $ 15,500  |
| Total    | $ 33,000  |

21. Based on records provided by Victim Company 1 and Company B3, beginning in or about November 2019, Company B1 stopped performing work for Victim Company 1 and Company B1's volume was shifted to Company B3. Then, in December 2019, Company B3's volume was shifted to Company B2. As previously described, Company B1 operated as and/or under the names of both Company B3 and Company B2 beginning in or about November and December 2019. According to interviews I conducted of Employee A and Employee B, and records I obtained from Victim Company 1, Company B3, and Company B1 and Company B2's factoring company, when Company B1 switched to other carrier names including Company B2 and Company B3, RISTIK was still the primary contact and/or listed representative for those companies.

22. During the months October 2018 to December 2019, either in its own name or the names of Company B3 or Company B2, Company B1 received increased trucking volumes in conjunction with the above-described payments from Company B1 and Company B4 to Company A. The following graph that I prepared shows the correlation between the payments made to Individual A, through his company, Company A, and the volumes received by Company B Companies:



23. According to records provided by Victim Company 1 and records provided by Company B3, between October 2018 and December 2019 (the timeframe of the scheme described herein), Company B Companies received at least approximately $13,000,000 in gross revenue from Victim Company 1. Based on my training and experience, and the investigation to date, I believe this revenue is what RISTIK obtained in exchange for paying Individual A at least approximately $280,000 in kickbacks during the same time period.

13

24. According to representatives from Victim Company 1, Individual A did not disclose his ownership of Company A, or his financial relationship with Company B1, to Victim Company 1. Similarly, according to Individual A, at the time he entered into a business arrangement with RISTIK and throughout their arrangement, Individual A was aware he was violating Victim Company 1's policies. Individual A never disclosed his relationship with RISTIK to Victim Company 1 or the payments he received from RISTIK.

25. According to Individual A, Individual A believed RISTIK was aware that their financial relationship violated Victim Company 1's policies and Individual A's duty to Victim Company 1. According to Individual A, this belief was based on RISTIK telling Individual A that RISTIK did not want to sign an agreement with Individual A while Individual A was still with Victim Company 1, and also based on RISTIK instructing Individual A to lie to Victim Company 1 and the FBI about the payments RISTIK made to Individual A.[3]

---

[3] On or about December 19, 2019, Individual A attended a meeting at Victim Company 1 that ultimately lead to Individual A's termination. According to Individual A, in advance of that meeting, RISTIK told Individual A to tell Victim Company 1 that the payments he received from RISTIK were for repayment of a loan. As instructed, Individual A made that false representation to Victim Company 1. According to Individual A, after being interviewed by Victim Company 1, Individual A deleted his text messages with RISTIK.

On or about June 22, 2020, the FBI interviewed Individual A. According to Individual A, during that interview he falsely told the FBI that the funds he received from RISTIK were for another business venture and were not in exchange for driving Victim Company 1 business to RISTIK. According to Individual A, the explanation he gave the FBI was based on a previous cover story RISTIK proposed that Individual A tell Victim Company 1 prior to Individual A's December 19, 2019 meeting with Victim Company 1. While it was true that RISTIK and Individual A were involved in another business venture—a tequila business— according to Individual A the payments were for generating Victim Company 1 business for Company B1 and not for Individual A's work on the tequila business.

14

**D.  USE OF INTERSTATE WIRES**

26. On or about April 15, 2019, RISTIK caused to be transmitted by means of a wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transmission resulting from a check from Company B1, in the amount of $5,000, drawn on Company B1's account at Village Bank & Trust, being deposited into Company A's account at a Chase branch in Illinois, which, according to an employee of Chase who I interviewed, was electronically sent via wire transmission to a location outside of Illinois for processing, and which funds were tendered as part of the above-described scheme to deprive Victim Company 1 of the honest services of Individual A.

## II. CONCLUSION

27. Based on the above information, I respectfully submit that there is probable cause to believe that on or about April 15, 2019, having knowingly and intentionally devised and participated in a scheme to defraud and deprive Victim Company 1 of its intangible right to the honest services of Individual A, by means of materially false and fraudulent pretenses, representations, promises, concealment of material facts, bribery, and kickbacks, defendant transmitted and caused to be transmitted by means of wire communication in interstate commerce, a writing, sign, and signal for the purpose of executing such scheme, in violation of Title 18, United States Code, Sections 1343 and 1346.

FURTHER AFFIANT SAYETH NOT.

TODD D. RATHBUN
Special Agent, Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone May 21, 2021.

Honorable JEFFREY CUMMINGS
United States Magistrate Judge

16